IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FERNANDO RODRIGUEZ,                )
                                   )
              Plaintiff,           )
                                   )
       v.                          )   No. 12 C 3705
                                   )
HOST INTERNATIONAL, INC.,          )
d/b/a HMS HOST CO.-CHICAGO         )
                                   )
              Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Fernando Rodriguez ("Plaintiff" or "Rodriguez") alleges

that Host International, Inc. ("Defendant" or "Host"),

subjected him to a racially hostile work environment,

terminated his employment because of his race and/or

national origin, and retaliated against him for engaging in

statutorily-protected activity.

Host denies these allegations and has moved for summary

judgment.  Host's motion is granted only as to Rodriguez's

retaliation claim for the reasons stated below.

I.

The following facts are presented in the light most

favorable to the non-moving party and presumed true only for

purposes of resolving the present motion.

Host operates various food and beverage outlets at

O'Hare International Airport in Chicago, Illinois.  Def.'s

Statement of Material Facts ("DSOF") at ¶ 9. Host hired Rodriguez, a Hispanic male of Mexican origin, as a bartender in 1992. *Id.* In 2007, Rodriguez transferred to the busiest Host-operated venue at O'Hare, a Chili's restaurant in Terminal 2 ("Chili's T2"). *Id*. at ¶ 12.

Carlos Perkins ("Perkins"), the store manager of Chili's T2, and Yordan Radev, an assistant manager, both said that Hispanics and Mexicans should be "pushed to the limit." Pl.'s Statement of Material Facts ("PSOF") at ¶ 7.[1] According to Rodriguez, Perkins swore at Hispanic and Mexican employees on a daily basis, including commands such as "move motherfucker," "clean the fucking floor," "leave the fucking bus pan and take another one," and "run." *Id*. at ¶ 9. When Rodriguez once asked Perkins if he could have the next available salad for a customer who had been waiting for almost an hour, Perkins erupted, "Does that fucking salad have your fucking name on it? Go back to the fucking bar, your salad's going to be ready whenever it's ready." *Id*. at ¶ 6.

---

[1] The fact that Samuel Hernandez, a waiter at Chili's T2, heard Perkins say that Hispanics should be pushed to the limit and reported this comment to Rodriguez does not make Perkins's statement inadmissible hearsay. The statement is not being offered for the truth of the matter asserted and is, in any event, admissible for its effect on Rodriguez (i.e., to show why he subjectively perceived his work environment as hostile or abusive). *See U.S. v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002).

In contrast, Perkins "almost never" swore at African American or Caucasian employees. *Id.* at ¶ 9.[2] Perkins would actually chat with African American servers in the back office even while customers were waiting in line. *Id.* Host's managers also allowed some African American employees to take one and half to three hour breaks while pushing Hispanic employees to work harder. DSOF at ¶ 45.

In addition to swearing directly at Rodriguez, Perkins allegedly ignored Rodriguez's complaints about coworkers Ronald Daniels and Chris Demofle swearing at him. PSOF at ¶¶ 4-5. When Rodriguez submitted a written complaint about Demofle, a Caucasian bartender, Perkins did nothing and later responded, "I don't got time for this bullshit." *Id.* at ¶ 5. Rodriguez also heard Perkins say, "Hispanics have feelings," while laughing and joking with Nelson Howard ("Howard"), an assistant store manager. DSOF at ¶ 40.

Another incident of coworker harassment involved Rodriguez and Anthony Boyce ("Boyce"), an African American cook. In 2009, Rodriguez submitted a written complaint about Boyce cursing at Hispanic employees, telling them to speak English, instructing them to go back to their home

_____

[2] Host attempts to portray Perkins as an equal opportunity bully by noting that three employees he allegedly cursed at are Filipino rather than Hispanic. *See* Def.'s Resp. to PSOF at ¶ 9.

countries, and threatening to call immigration.  PSOF at ¶
3.  Howard, an assistant manager, subsequently told
Rodriguez that Boyce was going to file a police report and
should be left alone.  *Id*.  Rodriguez does not know how the
investigation ended, but Host contends that Boyce received a
final warning.  *Id*.

Perkins also verbally harassed Rodriguez by referring
to him as a "gang banger" in the presence of coworkers on
three or four occasions: "Oh, I remember when Fernando used
to be a gang banger on 26th Street.  He used to chase me
around the block."  DSOF at ¶ 40.  Perkins noted that blacks
and Mexicans lived on opposite sides of the street when
making these comments.  *Id*.

In 2010, Rodriguez twice complained to Host's human
resources manager, Salem Issa ("Issa"), about Perkins
harassing Hispanic employees.  PSOF at ¶ 19.  Issa
responded, 'Yes, I know, I heard rumors about that."  *Id*.
Issa also told Rodriguez that Harry Lu ("Lu"), the general
manager of Host's operations at O'Hare, had already
instructed someone to investigate a written complaint from
Jorge Somoza and Federico Nuñez about Perkins harassing
them.  *Id*.  Neither party cites record evidence that Issa or
Lu followed up with Rodriguez about his complaints in 2010.

In addition to Perkins, Rodriguez contends that Yordan Radev ("Radev"), an assistant manager, also harassed him. Perkins allegedly instructed Radev to push Rodriguez's buttons. *Id.* at ¶ 14. According to Rodriguez, Radev blamed him for things that other employees had done and twice accused Rodriguez of drinking at work. DSOF at ¶ 16. Radev also took food away from Rodriguez while allowing Caucasian employees to eat in the food preparation area. *Id.* at ¶ 43. Radev also threatened Rodriguez several times in a two or three months period, saying, "You don't know me. I'm gonna get you." *Id.* at ¶ 42.

On several occasions, Rodriguez complained to Perkins and other managers about Radev's conduct. *Id.* at ¶ 16. Rodriguez reported that Radev singled him out and was always harassing, provoking, and questioning him. *Id.* When Rodriguez asked Perkins in December 2010 if he had spoken with Radev, Perkins laughed and said, "I'll talk to him." *Id.*

On December 23, 2010, Rodriguez and Radev got into an argument that led to Rodriguez being suspended and later terminated. *Id.* at ¶ 17. Radev was behind the bar checking inventory and noticed an open can of pineapple juice in the cooler, which violated sanitation rules. *Id.* at ¶ 18. When Radev questioned Rodriguez about the open can, Rodriguez

responded that he did not know who was responsible for leaving it inside the cooler. *Id.* Radev raised his voice and said, "Whaddya mean you don't know? It's your bar, you're responsible for this." *Id.*

After finishing a transaction, Rodriguez went to the back office and told Radev he did not appreciate being treated like a "fucking little kid" in front of customers. *Id.* at ¶ 19. Radev told Rodriguez to calm down, but also taunted him. When Rodriguez complained about Radev talking to the Hispanic bus boys "like dogs," Radev responded, "What 'cha gonna do about it?" Pl.'s Dep. 196:5-16. Nelson Howard was present in the back office during this argument. DSOF. at ¶ 20. Howard called Perkins and asked him how to handle the situation. *Id.* Perkins instructed Howard to suspend Rodriguez pending an investigation. *Id.* Host did not suspend Radev for this incident. PSOF at ¶ 15.

On December 29, 2010, Rodriguez and a union representative met with Issa and Perkins to discuss the December 23 incident. DSOF at ¶ 21. Rodriguez presented a written statement that read, in part, "I am not going to allow anybody to talk to me like I'm a dog, because that's the way some of the managers treat some of the employees." Pl.'s Dep. 175:13-16. Rodriguez explained during this meeting that he was referring to the way Perkins and other

managers treated the Hispanic employees.  *Id*. at 169:6-8,

238:13-14.  Issa said he favored returning Rodriguez to work

right away, but management had not reached a final decision.

*Id*. at 179:19-23; 181:1-3.

Issa and Perkins interviewed Radev, Howard, and one

other employee who witnessed the December 23 incident.  DSOF

at ¶ 22.  At the conclusion of this investigation, Lu, Issa,

and Perkins determined that Rodriguez had engaged in

insubordinate conduct towards a manager.  *Id*.  In light of

Rodriguez's history of verbal altercations with coworkers,

Host issued him a Notice of Termination on December 30,

2010.  *Id*. at ¶¶ 11, 23.

 After his termination, Rodriguez called Host's

employee complaint hotline, "Speak Up for Ethics," to report

that Radev had provoked him during the December 23 incident

and violated company policy by swearing in front of

customers.  DSOF at ¶ 24.  Kathleen Livingston

("Livingston"), Host's senior human resources manager,

investigated Rodriguez's hotline complaint, but found no

corroboration that Radev had provoked Rodriguez or violated

company policies.  *Id*. at ¶ 25.

On January 3, 2011, Rodriguez submitted a union

grievance regarding his termination and attached a copy of

his statement about Perkins and other managers treating

Hispanic employees "like dogs."  DSOF at ¶ 26.  On January

19, 2011, while his grievance was still pending, Rodriguez

e-mailed Lu's boss, Essi Pourhadi, with another complaint

about Perkins:

> Carlos Perkins is the one that should have been
> terminated a long time ago.  He used foul language
> on a daily basis.  He harasses and insults some
> Hispanics and Filipino employees and call[s] them
> names.

Pl.'s Dep. 282:14-19.  Rodriguez never received a response

to this e-mail.  *Id*. at 284:17-19.

Lu set up a private meeting with Rodriguez and Issa on

January 21, 2011.  *Id*. at 203:20-204:24.  According to

Rodriguez, most of the discussion at this meeting was about

Perkins harassing and swearing at employees.  *Id*. at 208:12-

19.  Rodriguez reiterated his complaint about Perkins

discriminating against Hispanics and reminded Lu and Issa

about Jorge Somoza's and Federico Nuñez's previous complaint

about Perkins harassing them.  *Id*. at 209:12-210:12.  Lu

said he was looking into the problem.  *Id*. at 210:13-14.

Lu asked Rodriguez what he wanted several times during

the January 21 meeting.  When Rodriguez said he wanted to

return to work, Lu turned to Issa and said, "Well, you see

all he wants is his job back."  *Id*. at 209:1-11.  Lu said he

could not do anything at the moment because of the union

grievance process, but later assured Rodriguez he would get his job back.  *Id.* at 212:16-19, 213:5-8.

On January 26, 2011, Host conducted a grievance hearing during which Rodriguez, Radev, and Howard each presented their version of the December 23 incident.  DSOF at ¶¶ 27-28.  No one, including Rodriguez, raised the subject of race or national origin discrimination during the grievance hearing.  *Id.* at ¶ 28.  After the hearing, the union negotiated a settlement with Host that allowed Rodriguez to return to work subject to a final warning.  *Id.* at ¶ 29.

Meanwhile, Host investigated multiple complaints about Perkins between January 2011 and March 2011.  *Id.* at ¶ 52.  In addition to Rodriguez, an assistant manager named Raphael Ramos had complained about Perkins's aggressive demeanor towards associates and other managers.  *Id.*  A representative from the Chili's corporate office and a group of servers had also complained about Perkins yelling and swearing.  *Id.*  Host gave Perkins a final warning about his aggressive behavior, but made no findings about race or national origin discrimination.  *Id.* at ¶ 53.

On March 2, 2011, after his reinstatement, Rodriguez submitted a written complaint to Lu signed by a total of six employees.  The statement read:

> Enough is enough. Enough harassment, enough
> intimidation, enough humiliation, enough name
> calling, enough favoritism. We the employees of
> HMS Host are accusing Carlos Perkins and some of
> his management staff [of] verbal abuse and
> disrespecting his employee. We demand respect and
> dignity.

*Id.* at ¶ 54. Lu's investigation of this complaint corroborated Perkins's aggressive behavior--for which he had already received a final warning--but did not uncover evidence of race or national origin discrimination. *Id.* at ¶ 55.

Perkins, Radev, and Howard have not supervised Rodriguez since he returned to work on or around February 13, 2011. DSOF at ¶ 46. Nonetheless, Rodriguez alleges that Host has retaliated against him by (1) changing the middle shift at Chili's T2 by one hour, which reduced his tip income; (2) instructing him to remove one of his earrings after he transferred to a Macaroni Grill restaurant; and (3) prohibiting him from storing his personal belongings behind the bar at the Macaroni Grill rather than in a designated storage locker. *Id.* at ¶¶ 49-50. Rodriguez remains employed by Host at a bar called Beaudevin.

On July 19, 2011, Rodriguez filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission alleging race and national origin discrimination

and retaliation.  Livingston, Host's senior human resources manager, investigated Rodriguez's charge by interviewing all managers at the Chili's T2 and seventeen Hispanic employees. *Id.* at ¶ 56.  In August 2011, Jorge Somoza and Antonio Mercado submitted written statements to Livingston complaining that Perkins discriminated against Hispanic employees.  *Id.*  Mercado's statement noted that the management at Chili's T2 pushed the Hispanic employees to work faster than others.  *Id.*  At the end of her investigation, Livingston concluded that there was not enough evidence to corroborate the allegations of race or national origin discrimination.  *Id.*

On May 14, 2012, Rodriguez filed the present lawsuit under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.[3]

## II.

Host has moved for summary judgment on Rodriguez's claims that he was (1) subjected to a racially hostile work environment; (2) suspended and later terminated because of his race and/or national origin; and (3) retaliated against

---

[3] "Although [S]ection 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996). Therefore, I need not analyze Rodriguez's statutory claims separately.

for complaining to human resources about Perkins treating Hispanic employees "like dogs" in December 2010.

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"In assessing whether [Host] is entitled to summary judgment, [I] examine the record in the light most favorable to [Rodriguez], the non-moving party, resolving all evidentiary conflicts in [his] favor and according [him] the benefit of all reasonable inferences that may be drawn from the record." *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012).

A.

To survive summary judgment on his hostile work environment claim, Rodriguez "must first produce evidence that the alleged harassment was severe or pervasive" such that his workplace was objectively and subjectively hostile. *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). "Second, [Rodriguez] must show that the hostile conditions were because of [his race or national origin]." *Id.*

"Finally, there must be a basis for employer liability."
*Id.*

1.

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Morgan R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Accordingly, "[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (identifying relevant factors). "Previous cases are not overly helpful in resolving this highly fact-specific inquiry." *Hall*, 713 F.3d at 331.

Rodriguez's evidence of a hostile work environment starts with Perkins and Radev declaring that Hispanic employees should be pushed to the limit. Radev singled out Rodriguez for extra scrutiny, blamed him for rule violations he did not commit, and twice accused him of drinking at work. Perkins harassed Rodriguez by swearing at him on a daily basis, pushing Hispanic employees to work harder than

non-Hispanic employees, and ignoring Rodriguez's complaints about other employees. Consistent with his view that Hispanic should be pushed to the limit, Perkins also joked about Hispanics having feelings and referred to Rodriguez as a "gang banger" on three or four occasions. When Rodriguez complained about even more offensive comments—-i.e., Anthony Boyce telling Hispanic employees to go back to their home countries and threatening to call immigration--the Chili's T2 management team told Rodriguez to leave Boyce alone.

Although no single incident stands out as particularly severe, I conclude that Rodriguez has presented enough evidence for a jury to conclude that his work environment was pervasively hostile. Rodriguez's claim compares favorably with the hostile work environment claim that survived summary judgment in *Hall v. City of Chicago*, 713 F.3d 325 (7th Cir. 2013). The employee in *Hall* presented evidence that "she reviewed useless videotapes, her colleagues were forbidden from speaking to her, she was prohibited from Division meetings, her efforts to take on more work were suppressed, and [her supervisor] subjected her to occasional verbal outbursts as well as one minor physical altercation." 713 F.3d at 331. She was not "prevented from completing her assigned tasks" or "assigned less favorable work" than any similarly situated coworker.

*Id.* at 332.  The Seventh Circuit nonetheless held that Hall had presented sufficient evidence of a hostile work environment: "[I]ncidents, which viewed in isolation seem relatively minor, [but] consistently or systematically burden women throughout their employment are sufficiently pervasive to make out a hostile work environment claim." *Id.; see also Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) ("[A] relentless pattern of lesser harassment that extends over a long period of time also violates the statute.").

While Hall's supervisor referred to her as "that woman" and once called someone on television a "slut" in her presence, Rodriguez has presented evidence that he was subjected to offensive, race-based harassment relating to his presumed immigration status, criminal history, and ability to endure abuse.  Rodriguez's workplace was also more overtly hostile towards Hispanic and Mexican employees than Hall's experiences with busy work, isolation, and occasional verbal outbursts.

When measured against the Seventh Circuit's application of the severe or pervasive standard in *Hall*, Rodriguez has presented enough evidence for a jury to find that his workplace was pervasively hostile from an objective standpoint.  Rodriguez's persistent complaints to human

resources and management also show that he subjectively perceived his work environment as hostile or abusive. Thus, Rodriguez has satisfied his burden of showing that his workplace was severely or pervasively hostile from both an objective and subjective perspective.

2.

In addition to satisfying the severe or pervasive standard, Rodriguez must present evidence that the harassment described above was connected to his race or national origin.

"Although a plaintiff does not need to identify an explicitly racial dimension of the challenged conduct to sustain a Title VII claim, she must be able to attribute a racial 'character or purpose' to it." *Vance v. Ball St. Univ.*, 646 F.3d 461, 470 (7th Cir. 2012) (quoting *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999)), *aff'd*, 133 S.Ct. 2434 (2013). Accordingly, the relevant inquiry at this stage is whether anything about the hostility Rodriguez experienced "suggests a [racially]-discriminatory motive." *Hall*, 713 F.3d at 333.

Here, Rodriguez has described several incidents in which his race or national origin was explicitly referenced: (1) Perkins and Radev saying that Hispanic employees should be pushed to the limit; (2) Perkins implying that Hispanics

16

do not have feelings worthy of respect; (3) Perkins making

jokes about Rodriguez's presumed history as a "gang banger"

who used to antagonize African Americans; and (4) Boyce's

offensive remarks towards Hispanic employees.  These

comments express hostility towards Rodriguez because of his

race or national origin and distinguish this case from

*Yancick v. Hanna Steel Corporation*, 653 F.3d 532 (7th Cir.

2011), where the employee "[did] not allege that he was the

target of any racial slurs, epithets, or other overtly race-

related behavior".  *Id.* at 544.

The facially neutral harassment directed at Rodriguez--

e.g., Perkins's pervasive swearing and dismissive response

to Rodriguez's complaints about coworkers--must be viewed

against the backdrop of these facially discriminatory

incidents.  *Hall* is instructive on the permissible

evidentiary connection between facially discriminatory

remarks and facially neutral incidents.  The court held that

a supervisor's reference to Hall as "that woman" was an

"ambiguous, context-dependent comment [that] could be viewed

as evidencing gender animus, which in turn permits a jury to

conclude that gender played a part in *all* of Johnson's

actions."  713 F.3d at 334 (emphasis added).

Applying *Hall* to the facts of this case, a reasonable

jury could find that Perkins's facially discriminatory

comments about Hispanics support an inference that his

*entire* course of conduct towards Rodriguez reflected racial

hostility.  Therefore, summary judgment for Host is not

appropriate.

3.

The final element of Rodriguez's hostile work

environment claim requires an evidentiary basis for imposing

employer liability.

Whether an employer is liable for a hostile work

environment turns on whether the alleged harassed was

perpetrated by a supervisor or coworker.

> If the harassing employee is the victim's co-
> worker, the employer is liable only if it was
> negligent in controlling working conditions. In
> cases in which the harasser is a "supervisor,"
> however, different rules apply. If the
> supervisor's harassment culminates in a tangible
> employment action, the employer is strictly
> liable. But if no tangible employment action is
> taken, the employer may escape liability by
> establishing, as an affirmative defense, that (1)
> the employer exercised reasonable care to prevent
> and correct any harassing behavior and (2) that
> the plaintiff unreasonably failed to take
> advantage of the preventive or corrective
> opportunities that the employer provided

*Vance v. Ball St. Univ.*, 133 S.Ct 2434, 2439 (2013).

The distinction between supervisors and coworkers does

not require separate analysis in this case because Host

cannot demonstrate that it exercised reasonable care in

responding to Rodriguez's complaints about either type of

harassment.  Host attempts to defeat employer liability by citing its anti-discrimination policies; Issa and Perkins's investigation of the December 23 incident; Livingston's investigation of Rodriguez's hotline complaint; Host's three month investigation of Perkins from January to March 2011; Lu's investigation of the petition from Hispanic employees in March 2011; and Livingston's investigation of Rodriguez's charge of discrimination in July 2011.  These arguments do not address whether or how Host responded to Rodriguez's two complaints to Issa in 2010 about Perkins harassing Hispanic employees and his written complaint about Anthony Boyce in 2009.  When drawing all reasonable inferences in Rodriguez's favor, the summary judgment record suggests that Host was negligent in responding to explicit complaints about race and national origin discrimination in 2009 and 2010.  *See Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) (describing prompt investigation as the "hallmark of reasonable corrective action").

Summary judgment is inappropriate because Host has not demonstrated that it exercised reasonable care to investigate and correct Rodriguez's pervasively hostile working conditions.

B.

Rodriguez's second claim is that Host terminated his employment because of his race or national origin.

"The plaintiff's task in opposing a motion for summary judgment is straightforward: he must produce enough evidence, whether direct or circumstantial, to permit the trier of fact to find that his employer took an adverse action against him because of his race." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) (describing "direct method" as the "default rule" for opposing summary judgment on employment discrimination claims).

Rodriguez has not presented "something close to an explicit admission" by Host that it suspended and later fired him because of his race or national origin. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir.2011). Therefore, Rodriguez's opposition to summary judgment under the "direct method" must rely on circumstantial evidence, such as:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631
(7th Cir. 2009). "A plaintiff need not produce evidence in
each category to survive summary judgment." *Diaz*, 653 F.3d
at 587.

Viewing the evidence in the light most favorable to
Rodriguez, he has presented enough circumstantial evidence
to submit his discriminatory termination claim to a jury.
On December 29, 2010, Rodriguez met with Issa and Perkins to
discuss his suspension. Rodriguez presented a written
complaint during this meeting about Hispanic employees being
treated like dogs. Issa told Rodriguez that he favored
returning him to work. In contrast, Perkins previously
declared that Hispanics should be pushed to the limit, joked
about Hispanics having feelings, and laughed when Rodriguez
complained about Radev only days or weeks before the
December 23 incident. "[A] district court 'cannot view the
record in small pieces that are mutually exclusive of each
other,' but must consider evidence of discriminatory
remarks, despite being attenuated from the adverse
employment action, in conjunction with all of the other
evidence of discrimination to determine whether the
plaintiff's claim can survive summary judgment." *Nagle v.
Village of Calumet Park*, 554 F.3d 1106, 1115 (7th Cir. 2009)

(quoting *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464
F.3d 659, 666 (7th Cir. 2006)).  Accordingly, Perkins's
previous comments about Hispanics are relevant to
interpreting his motivations when deciding whether Rodriguez
should be fired.

Rodriguez received a Notice of Termination on December
30, 2010, one day after his meeting with Issa and Perkins.
Host contends that Harry Lu, Issa, and Perkins collectively
decided to fire Rodriguez.  However, Lu did not interview
witnesses in the underlying investigation and Issa did not
favor terminating Rodriguez.  It follows that Perkins had
significant (perhaps decisive) input in Host's decision to
fire Rodriguez.  A jury could reasonably find that Perkins's
racial hostility towards Rodriguez--particularly his
insensitivity to complaints from Hispanic employees about
managers pushing them to the limit--was at least a
motivating factor in Host's decision to terminate him.

I need not evaluate Rodriguez's termination claim under
the indirect, burden-shifting framework set forth in
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),
because Rodriguez has presented enough circumstantial
evidence of discriminatory intent to survive summary
judgment.

Rodriguez's final claim is that Host retaliated against him after he told human resources in December 2010 that Perkins had discriminated against him.

Rodriguez has not identified any similarly situated employee who did not engage in protected activity and received more favorable treatment after December 2010. Therefore, I evaluate his claim only under the direct method of proof. *See Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (evaluating retaliation claim solely under direct method where plaintiffs failed to identify any possible comparators). "To establish retaliation under the direct method, [Rodriguez] must show that: (1) [he] engaged in activity protected by Title VII; (2) [Host] took an adverse employment action against [him]; and (3) there was a causal connection between [his] protected activity and the adverse employment action." *Coleman*, 667 F.3d at 859. A challenged action is materially adverse when "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation omitted). With respect to causation, Rodriguez must present evidence that would permit a reasonable jury to conclude

that "the desire to retaliate [against him] was the but-for cause of [Host's] challenged employment action[s]." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2528 (2013).

Rodriguez's retaliation claim fails because there is no evidence suggesting that his December 2010 complaint about Perkins was a "but for" cause of (1) the subsequent change in the middle shift at Chili's T2 or (2) the enforcement of dress code and bag storage policies at the Macaroni Grill. Rodriguez has not established that the store managers who made these decisions were even aware of his protected activity. A manager "cannot retaliate when [he or she] is unaware of any complaints." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000).

Rodriguez's broader contention that Host retaliated against him by ignoring his subsequent complaints of discrimination is also missing a causal link to his protected activity. In other words, Rodriguez has not presented evidence that, but for his December 2010 complaint about Perkins treating Hispanic employees "like dogs," Host would have kept him apprised of its investigations into his subsequent complaints of discrimination.

In sum, Host is entitled to summary judgment on Rodriguez's claim that he was retaliated against for complaining about Perkins in December 2010.

III.

Host's motion for summary judgment is granted only in part for the reasons stated above.

**ENTER ORDER:**

_Elaine E. Bucklo_
Elaine E. Bucklo
United States District Judge

Dated: November 20, 2013